**Jerry SUMNERS, Jr., and Carol Sumners, Plaintiffs–Appellants,**

v.

**SERVICE VENDING COMPANY, INC., Defendant–Respondent.**

Nos. 24932, 24949.

Missouri Court of Appeals, Southern District, Division Two.

Feb. 24, 2003.

Motion for Rehearing and Transfer Denied March 18, 2003.

---

Thomas W. Millington, Penni M. Groves, Millington, Glass & Love, Springfield, for appellant Jerry Summers, Jr.

Mark J. Millsap, J. Matthew Miller, Baird, Lightner, Millsap & Kollar, P.C., for appellant, Carol Sumners.

Charles B. Cowherd, Scott E. Garrett, Ginger K. Gooch, Husch & Eppenberger, LLC, Springfield, for respondent.

KENNETH W. SHRUM, Judge.

The plaintiffs' declaratory judgment petitions asked that a "Buy–Sell Agreement" between Jerry Sumners, Jr. ("Jerry, Jr.") and Service Vending Company, Inc. ("Defendant") be interpreted as *not* requiring

Jerry, Jr. to sell his stock in the company to Defendant. Defendant's responsive pleadings included a counterclaim for specific performance of the Buy–Sell Agreement. Via summary judgment, the trial court ruled adversely to the plaintiffs and ordered Jerry, Jr. to assign his stock to Defendant.

In Case No. 24932, Jerry, Jr.'s single point urges reversal based on alleged fatal defects in the contract, i.e., it was not supported by consideration, it lacked mutuality of obligation, and it imposed unreasonable restraints on Jerry, Jr.'s "alienation" rights. In No. 24949, Carol Sumners ("Carol"), Jerry, Jr.'s wife, urges reversal on the same theories advanced by Jerry, Jr. Further, she claims a prospective and unreleased "marital property" interest in Jerry, Jr.'s stock (although her name never appeared thereon) and insists the trial court erred when it ruled she had no "ownership interest, title or rights" in the subject stock.

In No. 24932, we reverse the summary judgment for Defendant and against Jerry, Jr. and remand for further proceedings.

In No. 24949, we affirm the judgment for Defendant and against Carol.

## STANDARD OF REVIEW

A motion for summary judgment will be granted if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Rule 74.04(c)(3). On appeal from a summary judgment, this court reviews the record in the light most favorable to the party against whom judgment was entered. *ITT Commercial Fin. Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 376[1] (Mo.banc 1993). This court does not defer to the trial court's ruling granting summary judgment be-

cause our review is de novo. *Id.* at 376[4,6]. Moreover, "[t]he key to a summary judgment is the undisputed right to a judgment as a matter of law; not simply the absence of a fact question." *Southard v. Buccaneer Homes Corp.*, 904 S.W.2d 525, 530[8] (Mo.App.1995).

## FACTS

At the time of trial, Defendant's corporate stock was owned as follows: Jerry L. Sumners, Sr. Revocable Intervivos Trust, 104 shares; Toby Sumners, 9 shares; Talbet Sumners, 24 shares; Tyler Sumners, 24 shares; and Jerry, Jr., 24 shares.[1] The stock certificates for these shares contained this endorsement: "The sale, assignment, transfer, pledge or other disposition of the shares of capital stock represented by this certificate are subject to a certain restrictive agreement dated November 20, 1992, a copy of which agreement is on file in the office of the corporation."

On November 20, 1992, each *minority* shareholder, including Jerry, Jr., signed an identically worded, but separate Buy–Sell Agreement with Defendant. The agreement's recited purpose was to "restrict the transfer of all shares [of Defendant] ... owned by Stockholder" so that when said "Stockholder's employment by [Defendant] is terminated, or upon the death of Stockholder ..., said stock shall not pass to the control of persons whose interest might be incompatible with the interests of [Defendant] and the remaining stockholders." In part, the Buy–Sell Agreement provided:

"III. *Retirement, Withdrawal, Termination:*"

"A. *Termination.* If Stockholder retires, withdraws from employment or his employment with the Corporation is otherwise terminated, such event shall con-

---

1. The four minority stockholders are sons of Jerry L. Sumners, Sr.

stitute an implied offer to the Corporation under the following price and terms."

"B. *Price.* The redemption price for each share of stock shall be $3,645.83."

"C. *Terms.* The redemption price of the . . . stock . . . shall be paid in cash, without interest, within 90 days after termination of employment with the Corporation."

All stock certificates of majority shareholder Jerry J. Sumners, Sr. ("Jerry, Sr.") contained the restrictive endorsement that referenced a November 20, 1992, restrictive agreement. However, Jerry, Sr. never signed a buy-sell agreement with Defendant, neither in his individual capacity nor as trustee of his revocable trust.

As to Jerry, Jr.'s stock, he paid $43,750 for twelve shares on June 1, 1987 ($3,645.83 per share), and on June 30, 1990, he paid the same amount for twelve more shares. When Jerry, Jr. made those purchases, no restrictions on alienation existed. The restrictions were added to his certificates after he signed the Buy–Sell Agreement.

On January 1, 2000, Jerry, Jr. terminated his employment with Defendant. Thereon, Defendant demanded it be allowed to redeem Jerry, Jr.'s stock in Defendant at the contract price, i.e., $87,500, and tendered that sum to him. Jerry, Jr. refused to accept payment and filed this declaratory judgment suit. He asked the court to declare the Buy–Sell Agreement unenforceable for lack of consideration and mutuality of obligation; that the court declare his stock was not validity restricted;

and that it order reissuance of Jerry, Jr.'s stock certificates without restriction. Later, Carol filed a separate declaratory judgment petition in which she asked the court to declare the Buy–Sell Agreement unenforceable as to her marital interest in the stock. Defendant's responsive pleadings included a counterclaim that sought to have the Buy–Sell Agreement specifically enforced.

On April 24, 2002, the trial court sustained Defendant's motions for summary judgment against Jerry, Jr. and Carol and denied Jerry, Jr.'s request for summary judgment against Defendant. In doing so, the court declared the Buy–Sell Agreement was "supported by sufficient and valid consideration" in that "minority shareholders (sons) were protected from having any non-family members (except any directly chosen by the founding majority shareholder-father) from becoming participants in this closely held, family owned corporation." After finding that paragraphs I–A and IV of the Buy–Sell Agreement "appear to completely restrict any transfer of the shares and . . . therefore make the Agreement void as illusory[,]" the court relied on the "savings" language of paragraph IX to delete the two void provisions and declare that a complete and binding agreement remained that gave Defendant "a first right of refusal to repurchase shares at a predetermined price upon . . . termination of employment . . . of a minority shareholder."[2] The court found Carol's claim to a marital interest in the stock "has no relevance in this case." With these findings made, the court or-

---

**2.** Paragraph I–A purported to prohibit Jerry, Jr. from transferring or encumbering his stock in any manner without obtaining Defendant's consent or offering it to the Corporation "in accordance with the terms . . . of this agreement." Paragraph IV purported to give Defendant the right to repurchase Jerry Jr.'s shares "at will" for $3,645.83 per share. Paragraph IX was a "savings" clause, i.e., it provided that if any part of the agreement was declared void, the remaining paragraphs would be binding as if the void parts were deleted.

dered Jerry, Jr. to endorse and deliver his stock certificates to Defendant.

Jerry, Jr. and Carol filed separate notices of appeal from the summary judgment thus entered. We ordered their appeals consolidated.

### DISCUSSION AND DECISION
### (No. 24932)

In No. 24932, Jerry, Jr. maintains, *inter alia*, that the trial court erred in sustaining Defendant's motion for summary judgment because the Buy–Sell Agreement "lacked any mutuality of obligation and was unsupported by consideration." Here, the mutuality of obligation doctrine is inexorably intertwined with the consideration issue; consequently, we consider them together.

■ Consideration, which is a basic element of a valid contract, *Allison v. Agribank, FCB*, 949 S.W.2d 182, 188[14] (Mo.App.1997), is something of value that moves from one party to the other. *Reed, Roberts Associates, Inc. v. Bailenson*, 537 S.W.2d 238, 240[1] (Mo.App.1976); *Melton v. ACF Indus.*, 404 S.W.2d 772, 777[7] (Mo.App.1966). In *Greenberg v. Morris*, 436 S.W.2d 734, 738 (Mo.1968), consideration was defined as:

"'a benefit to the party promising, or a loss or detriment to the party to whom the promise is made.' 'Benefit,' as thus employed, means that the promisor has, in return for his promise, acquired some legal right to which he would not otherwise have been entitled, and 'detriment' means that the promisee has, in return for the promise, forborne some legal right which he otherwise would have been entitled to exercise. *In other words, legal consideration contemplates two parties and ordinarily some consideration must flow from both parties.*"

*Id.* at 738[6] (citations omitted) (emphasis supplied).

■ A bilateral contract is one in which there are mutual promises between the parties to the contract, and each party is both promisor and promisee. *Coffman Indus., Inc. v. Gorman–Taber Co.*, 521 S.W.2d 763, 769[4] (Mo.App.1975). A contract that contains mutual promises imposing some legal duty or liability on each promisor is supported by sufficient consideration to form a valid, enforceable contract. *Allied Disposal, Inc. v. Bob's Home Serv., Inc.*, 595 S.W.2d 417, 419[2] (Mo. App.1980).

■ On the other hand, a promise *is not* good consideration unless there is mutuality of obligation, so that each party has the right to hold the other to a positive agreement. *Huttig v. Brennan*, 41 S.W.2d 1054, 1062[9] (Mo.1931). "'Mutuality of contract means that an obligation rests upon each party to do or permit to be done something in consideration of the act or promise of the other; that is, neither party is bound unless both are bound.'" *Aden v. Dalton*, 107 S.W.2d 1070, 1073[3] (Mo. 1937) (quoting *Gillen v. Bayfield*, 329 Mo. 681, 46 S.W.2d 571, 575 (1931)).

■ Here, Jerry, Jr. maintains the Buy–Sell Agreement was not valid and enforceable because consideration did not flow from both parties. Specifically, Jerry, Jr. claims no consideration flowed from the corporation as Defendant neither obligated itself to buy Jerry, Jr.'s stock nor assured Jerry, Jr. (either by contract or its conduct) that the status quo would be maintained as to the ownership and management of this closely-held family corporation. We find merit in this argument.

In *Lake Cable, Inc. v. Trittler*, 914 S.W.2d 431 (Mo.App.1996), three original shareholders and the corporate entity all signed a contract that provided no share-

holder could sell Lake Cable stock without complying with the agreement which gave Lake Cable a first right of refusal (at book value) and then gave other shareholders a successive right to purchase those shares at book value. One original shareholder assigned his stock to the corporation, leaving only two shareholders. Next, shareholder Trittler died. Thereon, Lake Cable and the surviving shareholder sued the personal representative of Trittler's estate for specific performance of the contract. The trial court ordered specific performance, and the personal representative appealed, and claimed the contract was unenforceable for lack of consideration. Writing for the eastern district, Judge Crane found sufficient consideration to support the contract and affirmed the specific performance judgment. The court reasoned as follows:

> "A right of first refusal or preemptive right may be created by a bilateral contract where there is a *mutual exchange of first refusals or preemptive rights.* ... Here, Lake Cable and *each of its shareholders* agreed to restrict the free transferability of the Lake Cable shares. In return each of the parties to the Agreement *received the benefit of maintaining control of this closely held corporation* by reserving to Lake Cable and its existing shareholders the right to choose their future associates and prevent unwanted outsiders from participating in the affairs of the corporation. Consideration to support the Agreement arises from the mutual exchange of first and successive preemptive rights in order to control share ownership."

*Id.* at 435[6,7] (citations omitted) (emphasis supplied).

In *Black and White Cabs of St. Louis, Inc. v. Smith,* 370 S.W.2d 669 (Mo.App. 1963), all shareholders in the corporation signed a contract wherein they agreed that upon the death of any shareholder, that shareholder's personal representative was to offer the deceased's stock to the corporation. *Id.* at 671. Following the death of shareholder Smith, the corporate entity (which was not a signatory on the subject contract) sued the administrator of Smith's estate for specific performance upon the theory it was a donee beneficiary of the contract. The trial court decreed specific performance, and its judgment was affirmed on appeal. In its opinion, the eastern district implicitly concluded that a contract which gives non-departing stockholders a first right of refusal to buy a departing stockholder's shares, *when signed by all stockholders,* benefits all stockholders. They benefit in that no stock can be sold to strangers to the corporation, thereby leaving original stockholders free to manage and attend to the affairs of the corporation without having to adjust or accommodate themselves to a new relationship with a stockholder who would be a stranger to their group and a possible competitor. *Id.* at 675–76.

Here, the trial court appears to have used the reasoning of *Lake Cable* and *Black and White Cabs* to conclude that the subject contract "was supported by sufficient consideration as all minority shareholders (sons) were protected from having any non-family members (except as directly chosen by the founding majority shareholder-father) from being participants in this closely held, family owned operation." On appeal, Defendant cites those cases to urge affirmance. Such reliance is misplaced, however, because the *mutual exchanges of first refusals by all shareholders* present in *Lake Cable* and *Black and White Cabs* are not present here. As the trial court correctly noted, Jerry Sumners, Sr. was not bound by any agreement; consequently, he could sell or alienate his stock in any manner he deemed fit, including to strangers or Defendant's business

competitors. Defendant neither promised nor obtained a comparable buy-sell agreement from Jerry, Sr. to assure Jerry, Jr. that none of the corporate stock would be sold to strangers to the corporation. In reality, Defendant promised nothing via the Buy–Sell Agreement. This follows because, contrary to what Defendant now asserts, the contract did not expressly or impliedly (1) obligate Defendant to buy Jerry, Jr.'s stock, (2) promise any different employment terms for Jerry, Jr. than had previously existed,[3] (3) oblige Defendant to pay dividends or bonuses to Jerry, Jr. by a formula or decisional basis different from that historically used,[4] or (4) assure Jerry, Jr. that Defendant would retain the option of a continued family ownership and management. In sum, nothing flowed from Defendant to Jerry, Jr. that was operative as consideration for Jerry, Jr.'s promise to sell his stock to Defendant once he dissociated himself from Defendant.

In so deciding, we do not overlook the non-specific recital of consideration contained in the Buy–Sell Agreement.[5] Neither do we ignore the rule that recitation of consideration is prima facie evidence that consideration to support the agreement exists and creates a presumption that the recitals are true. *See Hammons v. Ehney,* 924 S.W.2d 843, 850 (Mo.banc 1996); *In re Estate of Weinsaft,* 647 S.W.2d 179, 183[7] (Mo.App.1983); § 431.020. The corollary to this rule is that the presumption thus created is rebuttable and may be overcome by evidence to the contrary. *Hammons,* 924 S.W.2d at 850[24]; *Weinsaft,* 647 S.W.2d at 183[7]. Here, any presumption of consideration arising from the general recital of consideration was overcome by evidence that less than all shareholders mutually exchanged first refusals or preemptive rights; consequently, there was no assurance family control of Defendant would be maintained.

We have also considered and now reject Defendant's argument that the failure by Jerry, Sr. to sign a buy-sell agreement did not destroy the "mutual promises" of the minority shareholders. First, there were no "mutual promises" between minority shareholders. Each minority shareholder signed a separate Buy–Sell Agreement with Defendant. As such, Defendant and other minority shareholders could have mutually agreed to cancel their Buy–Sell Agreements and leave only Jerry, Jr.'s restrictive contract in place. Second, Defendant argues that *Shaffer v. Terrydale Management Corp.,* 648 S.W.2d 595, 599 (Mo.App.1983), stands for the proposition that a buy-sell agreement can be enforced although it was not binding on or signed by the majority shareholder. Its reliance

---

**3.** In conclusory fashion, Defendant claims consideration can be found in Jerry, Jr.'s "continued employment from [Defendant.]" We disagree. The Buy–Sell Agreement does not expressly promise continued employment, nor does it contain language from which it can be inferred, nor is there evidence to support such a claim. Although Jerry, Jr. had been given a job with Defendant before the Buy–Sell Agreement was signed, this fact cannot be consideration for the Buy–Sell Agreement because past consideration is not sufficient to support a promise. *Garrett v. Am. Family Mut. Ins. Co.,* 520 S.W.2d 102, 111[2] n. 2 (Mo.App.1974).

**4.** Defendant's brief contains another undeveloped and conclusory argument, namely, that consideration can be found in the fact that Jerry, Jr. "received dividends and bonuses from [Defendant]." This argument is also answered by the general rule that past consideration is not sufficient to support a promise. *Garrett,* 520 S.W.2d at 111[2] n. 2.

**5.** The Buy–Sell Agreement recites: "NOW, THEREFORE, in consideration of the mutual covenants, promises, agreements, representations and warranties herein, the parties covenant, promise, agree, represent and warrant as follows...."

on *Shaffer* is misplaced as neither consideration nor mutuality of obligation was an issue there.

We have also considered and now reject Defendant's argument that consideration flows from it via its promise to pay Jerry, Jr. a guaranteed price for his stock. The Buy–Sell Agreement only required Defendant to pay $87,500 for Jerry, Jr.'s stock if Defendant exercises its first right of refusal. In reality, Defendant's promise to pay $87,500 for Jerry, Jr.'s stock was enforceable only if Defendant wanted it to be so; as such, it was not operative as consideration for Jerry, Jr.'s return promise. *See Fenberg v. Goggin,* 800 S.W.2d 132, 135–36 (Mo.App.1990); *Middleton v. Holecroft,* 270 S.W.2d 90, 94 (Mo.App.1954).

In yet another argument, Defendant insists Jerry, Jr. received consideration because Jerry, Sr.'s "stock was encumbered by the restriction placed on it and by his agreement to pass the stock to his children under the terms of the June 23, 1990 and November 12, 1990 shareholder agreements." This argument has two false premises. First, the alleged restriction on Jerry, Sr.'s stock is illusory and unascertainable since Jerry, Sr. never signed a buy-sell contract with Defendant or anyone else. Second, there were no shareholder "agreements" dated June 23 and November 12, 1990, that obligated Jerry, Sr. to do anything. Such a claim is an apparent reference to minutes of shareholder meetings held June 23, 1990, and November 14, 1992.[6] In those meetings, Jerry, Sr. described a plan to his four sons that would bring them into management

and ownership of Defendant. At the November 14 meeting, Jerry, Sr. also told his sons "he had executed a new will and a revocable inter vivos trust setting forth the method and means for distribution of his corporate stock upon his death." Neither the minutes nor anything else in the record, however, can be read as an express or implied promise by Jerry, Sr. to leave his will or trust in place, without change, to assure the goal of family control of the corporation from then until his death. On this record, neither the restrictions on Jerry, Sr.'s stock certificates, nor the shareholder's minutes, nor those documents when read together, serve as consideration for Jerry, Jr.'s promises in the Buy–Sell Agreement.

Our review of this case in the light most favorable to Jerry, Jr. persuades us that Defendant has not shown an undisputed right to a judgment as a matter of law. Accordingly, we reverse the summary judgment for Defendant and against Jerry, Jr. We remand, however, because the record does not conclusively show that all available essential evidence about consideration has been presented. *King v. City of Independence,* 64 S.W.3d 335, 343 (Mo. App.2002).[7]

### DISCUSSION AND DECISION
#### (No. 24949)

■ Carol's appeal has two points relied on. The first is essentially the same as Jerry, Jr.'s argument, including the lack of consideration claim. This point has merit for reasons already discussed and need not be repeated.

---

6. Defendant's reference to November 12, 1990, is an apparent error. The second shareholder meeting that Defendant claims resulted in a shareholder agreement was held November 14, 1992.

7. We note that there are limited circumstances under which consideration, or lack

thereof, can be shown by extrinsic evidence in a controversy between original parties to an agreement. *CIT Group/Sales Financing, Inc. v. Lark,* 906 S.W.2d 865, 868–69[13] (Mo.App. 1995); *Rose v. Howard,* 670 S.W.2d 142, 145[1] (Mo.App.1984).

Carol's second point maintains the trial court erred when it (1) declared she had no ownership interest in Jerry, Jr.'s stock, and (2) ordered specific performance of a Buy–Sell Agreement that she had not agreed to or signed. Even though Jerry, Jr. and Carol were not divorced, Carol argues that statutes and case law governing "marital property" in a dissolution of marriage case compel a finding she had a property right in Jerry, Jr.'s stock; that because the subject stock was bought with "marital assets," it had to be recognized as "marital property under the sources of funds rule[;]" and the trial court could not effect a transfer of her "marital property" interest in the stock by ordering Jerry, Jr. to assign his stock certificates to Defendant.

Carol's argument is fatally flawed for the following reason. "Marital property" law is a statutory creation and *only* applies in domestic relation cases. Specifically, § 452.330 provides, *inter alia:*

"1. In a proceeding for dissolution of the marriage or legal separation, or in a proceeding for disposition of property following dissolution of the marriage by a court ... which lacked jurisdiction to dispose of the property, the court shall ... divide the *marital property* ...."

....

"2. *For purposes of sections 452.300 to 452.415 only,* "marital property" means all property acquired by either spouse subsequent to the marriage except: [exceptions listed]." (Emphasis supplied.)

Similarly, the "source of funds" doctrine mentioned in Carol's argument is a rule adopted by the Supreme Court of Missouri as the preferable method in dividing marital property at dissolution. *See Hoffmann v. Hoffmann,* 676 S.W.2d 817, 825 (Mo. banc 1984). The *Hoffmann* court's only stated purpose for embracing the "source of funds" doctrine was that it provided the most equitable way of dividing marital property under the 1974 Marriage and Dissolution Act. 676 S.W.2d at 824.

This is not a dissolution of marriage case, and Carol has neither pled nor proven the existence of a dissolution of marriage decree that awarded her a "marital property" interest in any of the subject stock. A "marital property" ownership interest for Carol in stock issued solely to Jerry, Jr. could only materialize via a decree in a domestic relations case of a kind described in § 452.330.1. As no evidence of such a decree was presented, the trial court did not err when it ruled Carol's claim to a "[marital] interest in the stock certificates ... has no relevance in this case, [sic] are only applicable to a dissolution of marriage action and not enforceable against third parties." It follows the trial court did not err when it ruled Carol had no ownership interest in the subject stock issued to Jerry, Jr. that would prohibit the Buy–Sell Agreement from being specifically enforced. Point II is denied.

The judgment favorable to Service Vending Company, Inc., and against Jerry, Sumners, Jr., is reversed, and the case is remanded for further proceedings. The judgment favorable to Service Vending, Inc., and against Carol Sumners is affirmed.

PARRISH, J., and RAHMEYER, C.J., CONCUR.